We'll hear the first case, MGM Resorts versus Malloy. Good morning, Your Honors. May it please the Court, Kevin King from Covington and Burling for the appellant, MGM. With me this morning are Neil Roman from Covington, Uri Clinton from MGM, and our local counsel, Jim Robertson from Carmody-Torrance. Your Honors, Connecticut Special Act 15-7 grants two Connecticut Indian tribes an exclusive pathway to develop the state's first commercial casino. The tribes asked the legislature to pass that law, legislators designed it to support the tribes, and the tribes hailed its passage as a major milestone. For over a year... If you win, what do you get? What do you want? Right. So the relief we request is at pages 32 to 33 of the appendix. In short, we want a declaratory judgment that Special Act 15-7 violates the Equal Protection Clause and the Commerce Clause and an injunction preventing the state defendants from enforcing it. Doesn't that depend upon your interpretation? You've got a different interpretation from the other side. We do, Your Honor. You say it's exclusive. They say it isn't. So you want us to interpret that? And if so, why would we want to certify that to the Connecticut Supreme Court? Certainly, Your Honor. We think the act is clear on its face for the reasons we put forward in our brief. It isn't. It doesn't use the word exclusive. It doesn't say all other activities, gaming applications are barred. Right. So if you thought the act was ambiguous, I think you do have... It gives a... I think you've made the point that it puts the thumb on the scale for the tribes, but a thumb on the scale is not the same thing as exclusive. Certainly, Your Honor. And so that would go to our third Equal Protection Claim, which is that we're boxed out entirely, right? And so you could certify that claim, which does depend on a construction of a state statute, to the Connecticut Supreme Court. Of course, we have two other Equal Protection Claims, which do not depend on that sort of state law interpretation. That is another question, and that is whether you have standing. Because there has to be an actual injury, and that means that the injury has to be concrete and must be imminent. And I don't see how it's imminent here, because as far as I can tell, you have expressed some interest in doing business, but you haven't made an application, and understandably, because of your interpretation, you haven't made an application for a casino. And so all we have is a party that says, gee, I'd like to have a casino someday. You know, we've studied it. We like it. Connecticut's a great market for a casino. That's not imminent, and how would any violation of the Act harm you? Well, a few things, Your Honor. First off, we did apply to access Special Act 15-7's exclusive development pathway. I know that, but that's because you assumed it was exclusive, and you were turned down on that. Right. That turns on the first question, whether the Act actually reads the way you say it does. The way we look at it, Your Honor, is that casino development or the casino process has two phases. Special Act 15-7 splits those phases in half, right? It focuses only on the first phase, which is the development of a casino. It's all of the things you would need to do to put together a viable casino project, which would include, among other things, identifying a site, arranging for financing, and most critically, executing a development contract with a host municipality. Let me ask you this. Just if I could ask one more question. Why wouldn't you make an application in the ordinary course outside of the Act to see whether, if you really are serious about a casino, see how that is treated? And the state, presumably, would come in and say, oh, you were right all along. This is exclusive. Or they would say it isn't. Well, again, two things, Your Honor. First off, it doesn't need to be an imminent injury if it's an ongoing injury, and that's the case at pages 13 to 17 of our reply brief, in particular, Texas View Lissage from the Supreme Court. As to filing an application with the state, the Supreme Court made clear in the Gratz decision, which we cite in our reply brief, the Sixth Circuit in Lockview, and this court in the Williams v. Lambert case, that a plaintiff need not participate in a discriminatory scheme to have standing to challenge it. And that especially is true for our Matthews argument under the Equal Protection Clause. That doesn't depend on whether we're boxed out entirely or we're not, because the Act, and especially Section 1B of the Act, grants exclusive rights to the tribes and not to us. So if they granted you, treated you as though you were a tribe, I hesitate because I find it hard to think of Samuel Goldwyn as being a Native American, but suppose that's kind of what you want, isn't it? I mean, that's one of the things you want, is if you were treated as though you were a tribe, then there would be equal treatment and that would be okay. That's right, Your Honor. We don't necessarily want the label of a tribe. We want the development rights that are afforded by this Act under whatever flavor they might be, whatever label that you might call it. So the two would be treated the same way they are. That's exactly right. We're looking for equal treatment here, and our injury in this case, Your Honor, is the denial of equal treatment. Can't you do the exact same things outside of the statute? That is, can't you seek proposals? Can't you engage in negotiations with municipalities? Because either way, you're still subject to getting approval or actually a change in law from the state legislature, right? We are if our injuries were about the operation of a fully licensed casino. But again, to go to my two-stage analogy, our injuries flow from the development of a casino, which is antecedent to and separate from the operation of a casino. It's ongoing right now. What is MGM deprived of under the statute? Just the ability to, well, what is it deprived of under the statute? Certainly, Your Honor. We are deprived, among other things, of a right to publish our request for proposals on a state agency's website. The Act, Section 1B, grants that right exclusively to the tribes and not to us. And so under Matthews, we have standing. And if you're looking for a case that looks at a disparate allocation like that and says it's a competitive harm, I'd point you in particular to the D.C. Circuit Certified Public Accountant's case, which is at 42 to 43 of our opening brief. So it's a little hard to draw out exactly what it is. It's a vague kind of an injury. That doesn't mean it's not a real injury. But I suppose you can make or have made the argument that the statute is a signal that if the two tribes get together and enter into a deal, it's a signal that there will be another statute that will approve it. And that signal is for them and it isn't for you. I see that my red light is on. May I answer? Yes, you can. Thank you, Your Honors. So, yes, we do argue that it sends a signal. And I think the signal matters even well before the state decides whether or not it's going to authorize a third casino. It matters in the development process. I'm sorry, but what I was saying is it's a signal that there will be another statute. It is a signal that there very well may be another statute. It's also a signal that the tribes project has the state's backing and support, which makes it easier, for example, for the tribes to make arrangements with investors. We're talking standing now, but ultimately, if you have standing, you would have to prove that. How would you go about proving the thumb on the scale? So we would prove the thumb on the scale. We'd have a classic equal protection analysis. It would depend on the type of scrutiny. We argue that strict scrutiny would be required because the Act discriminates based on national origin or race on its face. It gives several exclusive statutory rights. I mentioned one of them in Section 1B, but there are others exclusively to two entities based on their national origin or their race and not to us. And so it would basically be a question of law, Your Honors. It's not a factual question. I think there are questions about it. You're saying that's where I start to get trouble because how do you show the thumb on the scale means you put at a disadvantage, a real-life disadvantage. How do you show that it's a real-life disadvantage rather than a theoretical disadvantage? Sure, and so that's a standing question under the Supreme Court's Jacksonville decision. And, Judge Chin, I think that goes to your question. Yes, perhaps we could, as a theoretical legal matter, pursue a casino in Connecticut. But what the Supreme Court said in Jacksonville and what this Court said in Williams is even if you can go forward and do that, if you're not able to do it on the same terms on an equal basis as someone else that you're competing with. What advantage does putting the plan on the state agency website give you? Some would argue that that's a disadvantage because you've got to show your cards, et cetera. Yeah, so I think, again, the D.C. Circuit's certified public accounts case is really helpful in that regard because the tribes are voluntarily using this tribal business entity, right? Special Act 15-7 doesn't require them to form that entity. It doesn't require them to issue an RFP. It doesn't require them to do anything if they don't want to. But they're voluntarily. Using it shows that there is an advantage. Yeah, it's a basic law of economics. If its benefits didn't outweigh its burdens, they wouldn't be doing it voluntarily. But just to back up, this Court in Denny. Economics never worked, but God. Fair enough, Your Honors. That's the D.C. Circuit's language. Where do you want to put your casino? Well, we've identified several locations in Connecticut. Bridgeport is one place where we would, and we have alleged, and we think because this is. . . I thought that right next to Yale would be perfect. We would love to have the opportunity. And that really is a key issue in this case, Your Honors, is that we have alleged that we're ready, willing, and able to compete in Connecticut, in Bridgeport, and elsewhere. Well, ready and willing and able, but not having taken any steps to do it, you're restricted also by the 50-mile limit from Springfield, correct? We are. That's right, Your Honor. But, you know, so you have plans to do this, but you want to get this statute knocked out so you can go forward, or either be an equal participant. But I don't know that that's sufficient understanding at this point because you haven't taken concrete steps to establish yourself as a casino. Again, Your Honor, I'd point you to the Supreme Court's Gratz decision where the Supreme Court said that's a case that involved admissions at the University of Michigan, and the plaintiff in that case had not applied to transfer to the University of Michigan, but he had alleged that he was able and ready to do so, and the Supreme Court held that that was sufficient for standing. We here have alleged that we would participate in this development process, but for the discrimination, and if you're looking for another case, the Sixth Circuit's Lockview case says the very same thing. You've saved three minutes for rebuttal. Let's hear from the other side. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, I'm Assistant Attorney General Rob Dykert, representing the defendants in this matter. The District Court correctly held that MGM lacked standing to challenge Special Act 15-7, and specifically that MGM could not establish the first and foremost standing requirement of an injury. MGM is not cited, and defendants have not located a single case from any court where a standing injury was found to be imminent in a situation where the claimed concrete benefit to the competitor was contingent on future legislation, and that's what this case is. The leading case on this issue is Adiran v. Pena, which we discussed. If there is no benefit to the statute, which is what you're suggesting, why was it passed? Why are the tribes taking advantage of it? Your Honor, I would be loath to speculate as to the tribe's subjective intent, but I do think that if you look to the – and this is clear from MGM's briefing and complaint – if you look to the evolution of the act, it began as the initial bill would have authorized casino operations. The legislature – their concerns were expressed regarding kind of the complications that would result from that, and the legislature decided to take a more cautious wait-and-see approach, and the tribes may have decided – and I, again, can't really speculate as to what is in their minds – but that given that this – I understand the state's point to be that there's no concrete benefit to this statute, and if that's the case, why does it exist? Why was it passed? The reason why – that is correct, Your Honor, that there is no concrete benefit. And the reason why it was – or at least concrete benefit to the tribes. The reason why it was passed is because what it does – and I think this is very clear from the text of the statute itself – is it creates specific procedural requirements to address concerns unique to the tribes and requires that the process be transparent. For example, once the tribes – if and when the tribes issue an RFP, they're required to issue monthly reports to 12 separate state agencies. The idea here – Sorry. Another argument you're making is that this is burdensome on the tribes, more burdensome than an outsider. But wasn't one of the purposes here to keep the tribes from competing against each other and offer them a joint path to making an application? Correct, Your Honor, and that goes to – Because in the past, one's Foxwoods, the other's Mohican Sun or whatever, and therefore they're distinct entities and you didn't want them fighting with each other. Yes, Your Honor, because there's – because of the existing relationships, contractual relationships between the state and the tribes, there's unique legal kind of background surrounding kind of if one were to move first. And so there were reasons unique to the tribes that wouldn't apply to anyone else. And so to opposing counsel's point about MGM being excluded, our view, and the district court agreed, is that MGM is not excluded from taking any steps that it chooses to take. And we've publicly taken – Except it is what the statute does is makes it so that they are competing against both tribes acting together at the same time, right? That is correct, Your Honor. And that can't be a competitive disadvantage to have both of them? I would – I think if I were competing, I'd rather compete against each of them rather than both of them acting together, wouldn't I? Certainly MGM hasn't made that argument, Your Honor, and it's not evident that requiring two, as the materials describe, fierce competitors, to come together and operate jointly is necessarily a detriment to MGM. Why would it not be a disadvantage to not have access to the website? The tribes have access to the website. It's the government's website, and therefore it sort of has the imprimatur of the government. And so this is a disadvantage, it seems to me. You say, well, it's maybe – I don't know why. I mean, you know, I suppose it's because the tribes can't advertise and promote their own business, but I have no idea why they get it exclusively but not others. Certainly, Your Honor. And so I'd like to – there's kind of two responses to that. One is that there is no benefit – or at least no appreciable benefit to it in the sense that if you look at the record, the record is clear that the tribes are not relying on the state website. The tribes have a separate website that they are running. There was no cost to the posting on the state website. And really, the requirement of posting is just part of the transparency requirements that are being imposed on the tribes. But secondly, and more importantly, in my view, is that all of those questions and pretty much all of MGM's argument goes to the first part of the analysis, which is the question of injury. But if the Court looks to the Adirondack v. Pena – is it not plausible that being deprived of the ability to be on the website is an injury? I think we would need to look at the plausibility in the context of kind of the statutory framework, Your Honor. And so I would say that when you look at the overarching kind of other requirements that are imposed on the tribes, that it would not be plausible that the website posting itself would constitute an injury. And this Court is not required to accept just allegations of injury for purposes of standing under the Carter case and Ashcroft. Isn't it possible that – I'm sorry, I didn't – No, please. To use Judge Walker's word, imprimatur, this has the state sort of could be looked at as a stamp of approval. I'm New Haven, which is without the 50-mile according to – I believe so. According to Google, you know. But it's without. I'm New Haven. Why wouldn't I be inclined to look first at what has been essentially, in a way, approved, imprimatur is the word. Why wouldn't I say, geez, sitting around in the council meeting, say, they obviously want us to do it this way. They'll give us the statute. Why don't we do it this way? And I think, Your Honor, I understand the facial appeal of that argument. But I think it's quite – it would be quite myopic to look at it purely in that sense because if you look at the text of the statute, it couldn't be more clear that the legislature is sending a signal, to the extent it's signaling anything, that there's a real likelihood that nothing will ever be approved. And that's consistent with the evolution of the Act. It went from granting authority for licenses, backing off after the legal concerns were raised, and saying we need to slow down. We need to keep a very careful eye on everything that happens to make sure there's nothing that could risk complications. Are you saying that the statute – my tone of voice suggests an answer that I don't know. Sure. But are you suggesting that the statute actually casts doubt as to whether they would pass the second statute to permit such a casino operation? Yes, Your Honor. I believe it does, both from its text and from kind of how it – the legislative history to the extent the court were to look at that. I mean, I think the text is clear, and so the court would not need to look further. But the legislative history is very clear. And this is in MGM's complaint. It started off we were going to grant authority. Concerns were raised about the legal issues that that would create. And then it backed off very far to the point where they were not – we're not granting anything. We may never grant anything. I suppose that could be looked at the other way, and that is to say the legislature is saying, gee, we can't do this once. Let's do it piece by piece. You do this first, and then we'll grant the second statute, give you the second statute. And I think – and I want to make sure that I'm clear as to – I think, again, like all of the arguments that we're discussing to this point go to kind of the first part of the Pena analysis, which is whether there's an injury. Now, if the court looks to Adirondack v. Pena, which we discussed extensively in our briefing, the injury in Adirondack was very clear, and there was a clear financial incentive to the government to contract with the plaintiff's competitor. So this kind of – everything we're talking about here was clearly there in Adirondack. Would you agree that if the word exclusively was in there and that the tribes had exclusive rights, that they would have standing at that point? Because based on the Gratz decision, and they're ready, willing, and able, but there's a statute that stands in the way. It couldn't be clearer, we're hypothesizing, if it expressly excluded other competitors. I think that that would get MGM a ways along the road to establishing the first part of the Pena analysis, but it would not help with the second part, which is really, I think, the clearest part, and that's the imminence requirement that Your Honor was referring to. How could it be more imminent? What could they do under those circumstances if they had a statute that barred their ability to apply for a casino because they're not a tribe? Only tribes can have casinos in Connecticut. Let's assume the statute is read that way. If it were a complete bar and there were a prospect of a casino being authorized, then that would be a very different case than this one, Your Honor. But how close do you have to get? I mean, a prospect, they have an interest, they want to do it, they've identified some locations, but they say they're barred. And so what my question is is why doesn't this entire case turn on the interpretation of that statute as to whether it's a complete bar or not, as you say? Your Honor, my time is up. May I respond? Go ahead. I believe that this case, if you look, and I'm sorry to keep on going back to the same point, Your Honor, but like the Adirondacks v. Pena case, in that case there was a very clear injury. There was no question. The Supreme Court said there's no question that there's an injury here. So the court then said, in its own words, we must go forward to assess whether that injury is imminent for purposes of standing. And in that case what the court did is it looked to the question of whether the contracts using this benefit were going to be awarded in the future, and if so, whether the plaintiff in that case would be very ---- When would it become imminent here? I mean, you're saying it's too early, but does MGM have to wait until there's a contract signed and a statute is passed allowing it? And at that point, isn't it too late? No, Your Honor, it would not be too late. Ultimately, if and when a statute is passed that authorizes operation of a casino in an area that MGM could compete for. Now, keep in mind, MGM is excluded from most of the state of Connecticut by its own radius restriction. And so MGM said they referenced several areas in their materials. The only one I recall seeing is Bridgeport. The factual allegations asked at Bridgeport were that a couple of years ago a couple of people expressed interest. There's no indication of a current interest. And if you look at the legislative history ---- I'm just trying to find some real life out there. If they have no real interest in this, why are they paying four lawyers to sit down here? I mean, they think they have a heck of an interest, don't they? Where doesn't it match up? I mean, again, Your Honor, just like I would be loath to speculate about the tribes, I'd be loath to speculate about the tribes. There's a lot of speculation and anything weird. I understand. It may happen later. And I do think MGM, I would assume, and they can answer better for themselves, they're concerned about the potential competition. But the competition is nowhere on the radar screen. It's certainly not imminent. I'm sorry. I was just going to follow up on Judge Sachs' question. The municipalities that have submitted proposals, most of them are relatively close to Springfield. Is that true? Yes. Within 20 miles or so? And just to be clear, Your Honor, we have a discussion in our briefing about the facts that the court can consider in the standing analysis. And so at the time of the initial complaint in this action, nothing had happened. No municipality had responded. No RFP had been issued. No tribal business entity had been created. Nothing had happened. But if we were to look to the current status of things, every municipality that I'm aware of that has submitted in response to the RFP is well within the 50-mile radius restriction. And if a casino were built in one of those locations, that casino would be competing with MGM's casino in Springfield, I assume? It would, Your Honor. But MGM would not be allowed. It's barred by their agreement in Springfield, right? That's correct, Your Honor. They can't have a casino within 50 miles of it. That is correct. Could they negotiate? If it's just an agreement, could they negotiate their way down to 20 miles? Certainly, my understanding ‑‑ I'm just asking whether they have the ability. And, Your Honor, I don't know the answer. All I can say is that I know they have not, or at least I have not been made aware that they have. I'm just asking whether it's correct. Sure. And that I don't know enough about the details of their contract. Unless, Your Honor, I have any further questions. Thank you. Thank you very much. Your rebuttal. Thank you, Your Honors. Judge, I'll start with your question. The 50-mile restriction is purely contractual. And so, a standing decision based on that contract would essentially be this court sua sponte enforcing one side's rights under a contract. We could negotiate that. Although, I don't think it's important because we have alleged as a factual matter that we're ready, willing, and able to develop in Bridgeport, among other places. And, Judge Chin, you're absolutely right. This is a 12B1 motion. Our factual allegations, as long as they're well pleaded, must be accepted as true. And that's this court's decision in Carter and the Supreme Court in Iqbal, which said that plausibility is the standard. And plausibility is not a probability requirement. Our factual allegations, taken as true, merely need to support a reasonable inference that MGM is injured by the Axe discriminatory scheme. We're right at the outset of the case. There's been no factual development, no discovery. The merits of the case are not before the court. The question is whether we have Article III standing. And our allegations are plausible for all the reasons I've given, which would include, among other things, the tribe's own statements and the statements of the legislators. If it's plausible, this is elementary, but if it's plausible, then it becomes really interesting because then you actually have to prove that you were about to be injured, that there was imminent injury. That's right, Your Honor. We've got to prove standing at each successive stage of this case. And our burden increases as the stages move on. At the beginning, the burden is quite low. We need to plausibly allege. Then at summary judgment, we need to show a genuine issue of material fact, backed up with more than just allegations, right? We've got depositions, discovery, things of that nature to back it up. And then, of course, at trial, we'd actually need to prove that. But here we are right at the outset of the case. And just on the point of whether the act is a burden or a benefit, this court said in Denny v. Deutsche Bank that the court doesn't weigh burdens against benefits at the 12B1 stage. Instead, you look only at the benefit side of the ledger. So I think that's very important. We have alleged as a factual matter that Section 1B of the act, the website provision, benefits the tribes, for example, by making it easier for them to negotiate and to obtain financing from investors because investors are more likely to commit to a project if it has the state's backing than if not. And the Seventh Circuit in the Locke du Flambeau decision found standing based on exactly that sort of interest. It is a thumb on the scale, Your Honor. It is the state showing its imprimatur. But you don't need to take our word for it. You can instead look at the statements of the tribes and of the legislators. The tribes hailed this as a major milestone. What's that?  a state-sanctioned pathway. You look at 227 to 31. Is that what they said? It's in a call with investors. It's a quarterly earnings call, and they said this gives us a pathway. It's a major milestone for that reason. It shows that we have the state's legislature's support. That's what they said. That's at 227 to 31 of the appendix. But municipalities also have reacted. And if you look at page 80 at the bottom, this is a newspaper article, which, to Mr. Dykert's point, was published in July 2015, before we sued, before we filed our first complaint. And it says, Enfield, for example, whose interest was in doubt at one point, has more recently expressed serious interest. The tribes had said that municipalities were responding to this statute and were more likely to be interested in negotiating and executing a deal with the tribes for a casino than before. And the tribes come around right after that and say on A81, we're on the verge of incorporating. The chairman of the tribes said, we're close to announcing the formation of a new joint venture company that will manage the RFP process. So all of this was imminent right at the outset. Is there anything in the record? I know that the MGM submitted an application under the act, which I'm sure it would be denied, but is there any indication in the record that MGM has done anything to pursue a casino in Connecticut? There is, Your Honor. In our amended complaint, and I can give you the page if you give me a moment, we allege that we've conducted a feasibility study with respect to the Connecticut market, and we have determined that a Connecticut casino would be both desirable and plausible. This is at pages 21 to 22 of the appendix. MGM regularly develops casinos around the country, and we pursue this market in particular. We haven't had a chance to produce that feasibility study. I know it exists because we're at the 12B1 stage, but we would produce it if we got to summary judgment and discovery. Okay. Thank you, Your Honors. Thank you very much. We will reserve.